## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Dr. Omar Nieves-Ortiz<br>Cardiac Rhythm Consultants, PSC<br><br>    Plaintiffs<br><br>v.<br><br>Corporación del Centro Cardiovascular de<br>Puerto Rico y del Caribe;<br>Dr. Juan Carlos Sotomonte-Ariza;<br>Heart Rhythm Management, PSC,<br>  aka Heart Rhythm Management, Inc.;<br>Medtronic Puerto Rico Operations Co.;<br>Edgardo Hernández-Vilá,<br>  aka "Gary"Hernández-Vilá;<br>ABC Insurance Company, a fictitious name for<br>any entity insuring the defendants herein for<br>the claims made herein.<br><br>    Defendants | Civ. No. 20-<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

**TO THE HONORABLE COURT:**

NOW COMES THE PLAINTIFF, through the undersigned attorneys, and respectfully alleges and pleads as follows:

### I. INTRODUCTION

1.1 This action is brought on behalf of Dr. Omar Nieves-Ortiz ("Dr. Nieves"), a Cardiac Electrophysiologist who practices at the Centro Cardiovascular de Puerto Rico y del Caribe Dr. Ramón M. Suárez,[1] a hospital run by the defendant Corporación del Centro Cardiovascular de Puerto Rico y del Caribe ("the Corporación"), whose Medical

---

[1] The Centro Cardiovascular de Puerto Rico y del Caribe Dr. Ramón M. Suárez will be referred to hereinafter as "Centro Cardiovascular" or "the Hospital."

Director is defendant Dr. Juan Carlos Sotomonte-Ariza ("Dr. Sotomonte")

1.2 Dr. Nieves and his company, Cardiac Rhythm Consultants, PSC ("Cardiac Rhythm") present this claim to vindicate their rights under the Whistleblower provisions of the False Claims Act ("FCA").[2] Plaintiffs also claim damages resulting from the anti-competitive conduct of the defendants, which has the purpose and the result of imposing improper restraints of trade with respect to the practice of Cardiac Electrophysiology in Puerto Rico.

1.3 For the last decade, defendant Dr. Sotomonte has held positions of power in the Centro Cardiovascular. He is currently the Medical Director of the Hospital and previously served as President of the Medical Staff ("Facultad") and President of the Executive Committee of the Medical Staff of the Centro Cardiovascular, as well as Director of the Invasive Laboratory.

1.4 As Medical Director of the Centro Cardiovascular, Dr. Sotomonte receives a considerable salary paid for by the People of Puerto Rico.  Against all applicable rules and agreements, however, he continues to have a very active private practice, providing Cardiac Electrophysiological services at the Centro Cardiovascular through his private company Heart Rhythm Management, PSC ("Heart Rhythm Management") and his private office which he rents from Centro Cardiovascular.

1.5 Paintiffs contend that Dr. Sotomonte has utilized his positions of power at the

---

[2]The False Claims Act is implicated in this case because a large number of the patients who undergo procedures at the Centro Cardiovascular are participants in federally funded health insurance programs - Medicare or Medicaid (known in Puerto Rico as the "Reforma," among other designations). Additional federal payments are paid to the Centro Cardiovascular for services pursuant to federally sponsored health care plans for federal employees who are treated and undergo procedures at the Hospital, as well as when veterans are referred to the Hospital from the V.A. Hospital ("interfacility transfer.") On information and belief, there are also federal funds supporting teaching programs at the Centro Cardiovascular.

Centro Cardiovascular to develop a number of schemes and practices which violate both the False Claims Act and the anti-trust provisions.

1.6 The common thread of these schemes is that Dr. Sotomonte receives items of value, in the form of payments for services and/or expenses and referrals of patients, in exchange for favorable treatment for contracted services by the Hospital, including the supply of medical devices in the Centro Cardiovascular, as well as emergency services and transfers from other hospitals.

1.7 The claims submitted to the federal government for payment include certifications of compliance with the Anti-Kickback Statute ("AKS"), a law which prohibits the payment of such items of value and referrals in exchange for such favorable treatment.  Accordingly, the claims which have been submitted pursuant to these schemes are based on false certifications.

1.8 One of the entities which participates in and benefits from such schemes is defendant Medtronic Puerto Rico Operations Co ("Medtronic PR"), which supplies medical devices to the Hospital, including those used in Dr. Sotomonte's sub-specialty of Cardiac Electrophysiology.[3]  Plaintiffs allege that Medtronic has combined with Dr. Sotomonte in schemes which not only are anti-competitive restraints of trade, but also violations of the federal False Claims Act and the Federal Kickback Statute, which *inter alia* prohibits the contracting of medically related services and equipment in exchange

---

[3] The principal medical devices used by the Cardiac Electrophysiologists referred to herein are cardiac defibrillators and pacemakers, as well as certain monitors, all of which will be referred to hereinafter as "Electrophysiology Medical Devices."

for referrals.

1.9 Plaintiffs' contention is that Dr. Sotomonte and the Hospital combined with Medtronic PR and its salesman Edgardo Hernández-Vilá ("Gary Hernández" or "Mr. Hernández") to perpetuate a scheme for Medtronic to secure guaranteed market share, through the imposition of medical devices independently of physician's choice, in exchange for referral of patients to Dr. Sotomonte's private practice and other items of value paid to Dr. Sotomonte.

1.10 Plaintiffs allege other restraints of trade in the delivery of Cardiac Electrophysiology services, engaged in by Dr. Sotomonte and the other defendants, as well as others not named herein, which favor Dr. Sotomonte's practice and take advantage of his position as the Centro Cardiovascular's salaried Medical Director.

1.11 These practices include, but are not limited to, providing the guaranteed "market share" for Medtronic PR devices used in Cardiac Electrophysiology, agreements with other service providers for the transfer of patients from other hospitals and for Emergency Room Services at Centro Cardiovascular, all in exchange for referrals to Dr. Sotomonte's private practice and his personal lucre.

1.12 As set forth in more detail below, Dr. Nieves states a cause of action pursuant to the Whistleblower provisions of the False Claims Act, and another for the anti-trust injury he and his company have suffered due to the aforementioned practices.  He also alleges violation of due process and of the tort law of Puerto Rico.

## II. <u>JURISDICTION AND VENUE</u>

2.1 Plaintiffs invoke the federal question jurisdiction of this Court pursuant to *28*

*USC Sec. 1331,* since plaintiff's claims are based on the federal False Claims Acts, *31 USC §§ 3729-33* and the Sherman and Clayton Anti-Trust Acts, *15 U.S.C. sec 1 et seq.*, and the due process claim is actionable under *42 U.S.C. sec. 1983.*

2.2 Venue is proper in the District of Puerto Rico under 28 U.S.C. §1391, where the acts and omissions giving rise to Plaintiffs' claims occurred and all parties reside in Puerto Rico. Venue also lies in this District pursuant to 31 U.S.C. §3732(a) (False Claims Act) and 15 U.S.C 15 (Anti-Trust) because the defendants reside in this district and transact business here.

2.3 Pursuant to 28 U.S.C. §1367, there is also jurisdiction over supplemental Puerto Rico law claims arising under the same nucleus of operative facts.

## III. <u>PARTIES</u>

### A.  <u>Dr. Omar Nieves-Ortiz</u>

3.1 Plaintiff **Dr. Omar Nieves-Ortiz** is a Board Certified Cardiologist, Internist and Clinical Cardiac Electrophysiologist.  He graduated from the University of Puerto Rico School of Medicine.  He continued with post-doctoral training in Internal Medicine at the San Juan Veterans Administration Medical Center, and with two Fellowships, first in a three-year program in Cardiovascular Diseases, and thereafter in a sub-specialty program in Clinical Cardiac Electrophysiology at the University of South Florida.

3.2 Dr. Nieves has had privileges at the Centro Cardiovascular since 2012.  He rents a medical office from the Centro Cardiovascular and receives fees for services rendered for patients he attends to at the Hospital and his private office at the Centro Cardiovascular.

3.3 As an Electrophysiologist, Dr. Nieves performs evaluative procedures as well as implantations, using devices produced and marketed by the medical device industry.

**B. Plaintiff Cardiac Rhythm Consultant, PSC**

3.4 Plaintiff **Cardiac Rhythm Consultants PSC**. is a professional services corporation which Dr. Nieves founded in September of 2010, and from which he derives his professional services income.

**C. Defendant Corporación del Centro Cardiovascular**

3.5 Defendant **Corporación del Centro Cardiovascular de Puerto Rico y del Caribe ("the Corporación")** is a state-created, tax-exempt, non-profit public corporation organized and existing under the laws of Puerto Rico. The Enabling Act of the Corporación, *24 LPRA §§ 343a* et seq., describes it as a public corporation with a legal existence and personality separate and independent from any other agency or instrumentality of the Government of Puerto Rico.

3.6 The Corporación has the statutory authority, among other things, to adopt and amend rules and regulations, to sue and be sued, to borrow money from public or private sources, to issue bonds, to negotiate and enter into all kinds of contracts, documents and other public instruments, with persons, firms, corporations, government agencies and other entities, to appoint, contract and designate medical personnel for treatment purposes, to purchase all materials, supplies, equipment, and parts required for the purposes for which the Corporation was formed, as well as to dispose of such materials, to own, acquire and transfer assets, including real property, and to participate with others in joint ventures. *See, generally, 24 LPRA §343b - 343k.*

3.7 The Corporación is governed by a Board of Directors ("the Board"), which includes three *ex oficio members* -the Secretary of Health of Puerto Rico, the Chancellor of the Medical Sciences Campus of the University of Puerto Rico and the Executive Director of the Puerto Rico Medical Services Administration of the Commonwealth of Puerto Rico -- as well as two representatives of the Puerto Rican Cardiology Society, and a representative of a nonprofit cardiology foundation.

3.8 The Board has the authority to name an Executive Director of the Hospital, as well as a Medical Director who reports to the Executive Director. *24 LPRA §§ 343c.*

3.9 The Board is also tasked with remitting bi-annual reports to the Legislature and several other government officials and entities. *24 LPRA §§ 343a and 343i.*

3.10 The Corporación operates the Centro Cardiovascular, which is widely recognized as one of the premier medical facilities in Puerto Rico and the principal medical and teaching center dedicated to the diagnosis, treatment and prevention of cardiovascular disease.

**D.  Defendant Dr. Juan Carlos Sotomonte-Ariza**

3.11 Defendant **Dr. Juan Carlos Sotomonte-Ariza** is a Cardiac Electrophysiologist.

3.12 Dr. Sotomonte attended medical school at the Pontífica Universidad Javeriana in Bogotá, Colombia and did his internship and post-graduate studies at the University of Miami/Jackson Memorial Hospital and at Case Western Reserve University.

3.13 Shortly after he arrived in Puerto Rico approximately fifteen years ago, Dr.

Sotomononte became a member of the Medical Staff of the Centro Cardiovascular.

3.14 In 2010, Dr. Sotomonte was appointed the President of the Medical Staff and President of the Executive Committee of the Medical Staff.

3.15 In approximately 2014, Dr. Sotomonte was named Director of the Invasive Laboratory, where many electrophysiological procedures are performed.

3.16 In 2015, the Board of Directors of the Centro Cardiovascular named Dr. Sotomonte as Medical Director, and he has exercised the powers of the Medical Director since that time.

3.17 Dr. Sotomonte has a private medical practice as an Electrophysiologist, which he operates from an office in the Centro Cardiovascular, the same hospital where he serves as Medical Director. He receives fees for services rendered in the facility, in addition to the substantial salary he receives as Medical Director of the Hospital.

3.18 Dr. Sotomonte's appointment as Medical Director represented the first time in history that a physician with an active private practice at the Centro Cardiovascular itself was appointed to that position.

3.19 His appointment was contingent on his receiving a waiver ("dispensa") from the Office of Governmental Ethics ("OEG"), precisely to attend to potential conflicts of interest arising from this appointment as Medical Director.

3.20 As set forth in more detail below, Dr. Sotomonte has violated the requirements of the "dispensa" which eventually issued.

**E. Defendant Heart Rhythm Management, P.S.C.**

3.21 Defendant **Heart Rhythm Management P.S.C.**, (formerly Heart Rhythm

Management, Inc.) is a professional service corporation formed by Dr. Sotomonte in 2009, under which he manages his private medical practice.

3.22 Heart Rhythm Management has had a number of contracts with Medtronic-related companies for "Associated Research," totaling more than $141,000.00 over a five year period between 2015 and 2019.

**F. Defendant Medtronic Puerto Rico Operations Co.**

3.23 Defendant **Medtronic Puerto Rico Operations Co**. ("Medtronic PR") was incorporated in the Cayman Islands and is registered as a foreign (non-U.S.) corporation authorized to do business in Puerto Rico, where it has its principal place of business.

3.24 Medtronic PR is a subsidiary of Medtronic, Inc., a Minneapolis-based, Ireland-headquartered global publicly-traded medical device company which operates in some 160 countries through over a hundred subsidiaries, including Medtronic PR.[4]

3.25 Medtronic PR manufactures and sells medical products such as implantable cardiac pacemakers and implantable cardioverter defibrillators (ICDs), as well as a number of other products used for diagnosing and treating hearth rhythm disorders.

3.26 The Cardiac Rhythm & Heart Failure division of Medtronic, Inc. develops, manufactures, and markets products for the diagnosis, treatment, and management of heart rhythm disorders and heart failure.

3.27 Medtronic PR engages in sales efforts directed at physicians and hospital

---

[4]Medtronic, Inc. and its associated and subsidiary entities may be referred to collectively herein as "Medtronic." When "Medtronic PR" is utilized, reference is being made to the Puerto Rico operation of Medtronic. In all other instances where a specific Medtronic is not referenced, it should be understood that the Plaintiff is referring to Medtronic, Inc. and its subsidiaries and related entities.

facilities in Puerto Rico, in order to promote the purchase of its products. It also provides services related to the monitoring of patients and the efficacy of the devices utilized by the physicians.

3.28 Medtronic PR has entered into a number of different contracts with the defendant Corporación, which operates Centro Cardiovascular, for the purchase and utilization of its medical devices, including those employed by the Cardiac Electrophysiologists with privileges at Centro Cardiovascular.

## G. Defendant Edgardo Hernandez-Vilá

3.29 Defendant **Edgardo Hernández-Vilá,** is the Medtronic PR sales representative who is assigned to the Centro Cardiovascular, marketing its products and providing technical advice and services related thereto.

3.30 In that capacity, Mr. Hernández sells Medtronic products to the Hospital, commissioning on each of the products sold and thereafter providing services such as monitoring, programming and follow-up of implanted devices.

3.31 These services by Mr. Hernández often take place in the private offices of Cardiologists outside of the Centro Cardiovascular, placing Mr. Hernández in frequent contact with such physicians, and allowing him to be in a position to influence decisions by those physicians with respect to referrals of patients for specialized Cardiac Electrophysiological procedures at the Centro Cardiovascular.

3.32 He also has considerable contact with "Fellows," graduate physicians who are completing their training through the University of Puerto Rico Medical School at the Centro Cardiovascular and who represent potential referring physicians for Cardiac Electrophysiologists in Puerto Rico.

3.33 Mr. Hernández schedules social activities and referral meetings with Cardiologists who refer patients to Cardiac Electrophysiologists, as well as with the Fellows in training at the Hospital.

3.34 On information and belief, Mr. Hernández uses these contacts and his influence with these physicians to benefit Dr. Sotomonte through referrals.

3.35 On information and belief, Gary Hernández has worked with Dr. Sotomonte to influence the assignment of favorable "market share" to Medtronic PR among the companies bidding for the contracts for the Hospital's purchase of medical devices to be implanted by the Cardiac Electrophysiologists.

3.36 Gary Hernández has a legal and/or common law marriage to Dr. Gladys Irizarry-Lugo ("Dr. Irizarry"), an anesthesiologist who has served as President of the Medical Staff, as well as President of the Executive Committee of the Medical Staff, at the Centro Cardiovascular since early 2019.

3.37 Through her Company, Cardiovascular Anesthesia of PR, PSC, Dr. Irizarry has an exclusive contract for the provision of anesthesia services at the Hospital, with the last contract for those services being approved by Dr. Juan Carlos Sotomonte.

## H. Fictitious named defendant ABC Insurance Company

3.38 "ABC Insurance Company" is a fictitious name standing for any entity which has issued insurance policies covering any of the defendants and the actions and omissions set forth herein.  The identity of such companies is not known to the plaintiffs at this time.

## IV. <u>FACTS GIVING RISE TO THE CAUSES OF ACTION</u>

### A. <u>Cardiac Electrophysiology and Medical Device Supplies</u>

4.1 Cardiac Electrophysiology, a sub-specialty of cardiology, involves the evaluation and treatment of rhythm disorders of the heart.

4.2 Cardiac Electrophysiologists are trained in therapeutic and surgical methods of elucidating, diagnosing and treating heart rhythm disturbances, including but not limited to drug therapies and surgical implantation of pacemakers and implantable cardioverter-defibrillators.

4.3. Credentialed Electrophysiologists typically undergo seven to eight years of additional training after medical school, with one to two years of additional training after becoming Cardiologists.

4.4 Due to the nature of the work performed by these physicians, Cardiac Electrophysiologists depend on the purchase by hospitals where they have privileges, of highly sophisticated medical devices for implantation and/or for diagnostic purposes.

4.5 On information and belief, the average price of the Electrophysiology Medical Devices is between $2,000.00 and $17,000.00.

4.6 The cost of these Electrophysiology Medical Devices is billed to the patient or to his/her insurance carrier, or to public insurance and federally funded benefit programs such as Medicare and Medicaid (commonly known in Puerto Rico as the "Reforma.")

4.7 There are three (3) companies currently supplying such products for Cardiac Electrophysiology procedures in Puerto Rico: Medtronic, Boston Scientific del Caribe, Inc. ("Boston Scientific") and Abbott Laboratories (formerly St. Judes Medical, Inc.)

4.8 These companies assign specific sales representatives to promote and sell devices at major hospitals in Puerto Rico and to provide technical advice, as well as the follow-up services mentioned above.

4.9 Patients in need of Cardiac Electrophysiology services rarely go directly to a Cardiac Electrophysiologist in search of treatment, but rather are referred to the Electrophysiologists either by these other physicians or through Emergency Room (ER) staff when patients arrive at the Centro Cardiovascular ER in moments of crisis.

4.10 Accordingly, the practice depends heavily on referrals from treating physicians, particularly from Cardiologists (commonly referred to as "referidores").

4.11 As noted above, Medtronic's salesperson for Centro Cardiovascular is defendant "Gary Hernández," the husband of Anesthesiologist Gladys Irizarry, who is the President of the Medical Staff of Centro Cardiovascular, as well as President of the Executive Committee of the Medical Staff.

## B. The role of the Centro Cardiovascular in the practice of Cardiac Electrophysiology in Puerto Rico

5.1 The Corporación del Centro Cardiovascular de Puerto Rico y el Caribe operates a first-class hospital known as the Centro Cardiovascular, which is considered by many to be the premier facilities for cardiovascular procedures and treatment in Puerto Rico.

5.2 Centro Cardiovascular is the only hospital facility in Puerto Rico which is dedicated exclusively to treatment of cardiovascular disease, with patient access to all significant cardiovascular services.

5.3 It is the only public hospital offering many of the cardiovascular services

required by the citizens of Puerto Rico, providing services for indigent patients, in addition to those with private insurance or otherwise able to pay for such services.

5.4  It has on its staff a full complement of physicians who have been trained in highly specialized cardiovascular specialties and sub-specialties, including General Cardiology, Interventional Cardiology, Cardio-Thoracic Surgery, Peripherovascular Surgery, Cardiac Electrophysiology and Heart Failure and Transplant Cardiology.  It is also the only hospital facility in Puerto Rico with a Heart Transplant Program.

5.5 Located in the Puerto Rico Medical Center ("Centro Médico") near the Medical Sciences Campus of the University of Puerto Rico, the Hospital is also a training facility for Cardiology programs of the School of Medicine.

5.6 The Centro Cardiovascular's website describes it as a facility providing high-quality health services through "the prevention, diagnosis, treatment and rehabilitation of cardiovascular conditions in the most cost effective manner, generating measurable benefits for our community."Cardio/Sobrenosotros/Pages/default.http://www.agencias .pr.gov/agencias/aspx. (*Translation provided*).

5.7 Patient choice for Cardiac Electrophysiology services in Puerto Rico is very limited. On information and belief, there are only fourteen (14) practicing Cardiac Electrophysiologists in Puerto Rico, magnifying the effect of the practices detailed herein.

5.8 Five (5) of the fourteen (14) electrophysiologists in Puerto Rico, including plaintiff Dr. Nieves and defendant Dr. Sotomonte, practice and perform procedures at the Centro Cardiovascular.

5.9 With these five Cardiac Electrophysiologists on its Medical Staff, the Centro

Cardiovascular has the highest concentration of Electrophysiologists at any facility on the island.

5.10 Of the remaining Cardiac Electrophysiologists who do not perform procedures at the Centro Cardiovascular, two are employees of Dr. Sotomonte's company, defendant Heart Rhythm Management.

5.11 One of these employees of Heart Rhythm Management is Dr. Hilton Franqui, a Cardiac Electrophysiologist who for several years has been the Program Director of the Cardiology training program of the University of Puerto Rico School of Medicine.[5]

5.12 The contracting procedures at the Centro Cardiovascular which are detailed below deprive the citizens of Puerto Rico with serious heart disease requiring Cardiac Electrophysiological services at the Centro Cardiovascular from any choice regarding which devices will be used, and eliminate physician choice in the utilization of such devices.

5.13 On information and belief, Centro Cadiovascular has the largest market share for Cardiac Electrophysiology Services in Puerto Rico, outpacing any other Hospital providing these services.

5.14 Because of the prominence of Centro Cardiovascular as the only Hospital fully-dedicated to cardiovascular disease, as well as the fact that it has more than one third of all practicing Cardiac Electrophysiologists in Puerto Rico, the Centro Cardiovascular, through its Medical Director and its practices and procedures, have the potential for monopolistic control of Cardiac Electrophysiological services in Puerto

---

[5] On information and belief, Dr. Hilton Franqui's contract with Dr. Sotomonte's company, Heart Rhythm Management, provides for a considerable monthly salary in exchange for an agreement not to perform any procedures at the Centro Cardiovascular, where Dr. Sotomonte maintains his practice and serves as the Medical Director.

Rico.

## C. Dr. Juan Carlos Sotomonte's rise in Centro Cardiovascular and his use of his powers as Medical Director

6.1 As noted above, Dr. Sotomonte has held several positions of power at the Centro Cardiovascular for approximately a decade.

6.2 On July 16, 2015, Dr. Sotomonte assumed the role of Acting Medical Director of the Centro Cardiovascular.

6.3 In August of 2015, the Board of Directors of Centro Cardiovascular decided to extend the position of Medical Director of the Hospital to Dr. Sotomonte, pursuant to Article 4 of the Enabling Act for the Centro Cardiovascular, *24 LPRA §343c*.

6.4 This was the very first time in history that a member of the Medical Staff with a private practice and an office in the Hospital would also be the Medical Director of the facility, a situation which is wrought with potential conflicts of interest stemming from this dual role of one physician.

6.5 On September 23, 2015, the then Executive Director of the Centro Cardiovascular extended to Dr. Sotomonte his official appointment as Medical Director of the Hospital, at a yearly salary of $133,404.00, with full benefits as a public employee of Puerto Rico, including vacations, sick leave, medical plan and Christmas bonus. The appointment was effective October 1, 2015.

6.6 The letter agreement included *inter alia* the following terms:

a. Dr. Sotomonte was required to dedicate no less than 37.5 hours weekly to his duties as Medical Director;

b. Although he was allowed to continue his private practice at the Hospital, he was to be available at all times to perform his functions as

Medical Director, unless he was required to attend to exigencies related to a patient, with such possible conflict brought immediately to the attention of the Executive Director of Centro Cardiovascular.

c. Dr. Sotomonte was to abstain from any intervention in the assignment of operating rooms for procedures,[6] if the use presented a conflict of any kind with respect to his private practice.

d. In situations which "could be interpreted as potentially being in an indirect or direct conflict with the above requirements," he was to bring the issue immediately to the attention of the Executive Director.

6.7 Dr. Sotomonte's contract as Medical Director was conditioned on obtaining a "dispensa" (waiver) from the Office of Governmental Ethics of the Commonwealth of Puerto Rico and compliance with any conditions therein.

6.8 On September 24, 2015, Centro Cardiovascular submitted the Consult to the OEG, which eventually approved a "dispensa" on April 22, 2016. The "dispensa" allowed Dr. Sotomonte to continue to occupy the position of Medical Director, conditioned upon his abstention from activities which could be seen as a conflict of interest (eg: assignments of operating rooms), as well as the prohibition which limited his private practice to no more than one day per week. (Ethical Consult No.16-061)

### D. The Intricate Web of Relationships Medtronic, Hernández and Dr. Sotomonte

7.1 Throughout the time during which Dr. Sotomonte has held positions of power at the Centro Cardiovascular, this defendant has had an ongoing commercial

---

[6]These procedures are done in the operating rooms or in the Invasive Laboratory.

relationship with Medtronic PR and Medtronic.

7.2 This commercial relationship includes services provided to Medtronic, individually and through Dr. Sotomonte's company, Heart Rhythm Management, which has received substantial grants for research purposes.

7.3 Over time, Medtronic has also afforded favorable treatment to Dr. Sotomonte with respect to referrals, grants for research, promotional activities and consultantships.

7.4 For approximately a decade, Dr. Sotomonte has served on the Medical Advisory Board of Medtronic, Medtronic PR's parent company.

7.5 According to information published by Medtronic, among the "advisory services" provided by physicians to Medtronic are the provision of "critical expert advice regarding the market potential for new products and technologies, feedback on improving existing products, and general feedback regarding Medtronic's performance, reputatin and areas for improvement."

7.6 Medical advisory services may also include "medical and/or strategic perspectives on subjects such as market research or development, therapy focused activities, healthcare policy, business strategy, scientific or medicaladvisory boards and commercial advisory panels," as well as the development and/or review of "the contents of marketing materials," and participating "post commercial safety and monitoring boards."

7.7 Over the years, Medtronic, Inc and one of its subsidiary, Medtronic Vascular, Inc. have made substantial payments to Dr. Sotomonte and, on information and belief, Heart Rhythm Management, and as noted above, have designated Dr. Sotomonte as a Member of the Electropyhysiology Advisory Board for Medtronic, Inc. in Minnesota.

7.8  From 2015 to 2019 (the last reporting year), Dr. Sotomonte's compensation from Medtronic, Inc and its subsidiaries increased dramatically. The federal Center for Medicare and Medicaid Services reports on its website *https://openpayments data.cms.gov/physician/351088*, that in the years between 2015 (when Dr. Sotomonte became the Medical Director) to 2019, he has received over $141,000,00 in payments from Medtronic, Inc and its subsidiaries, divided as follows:

> $124,321.00 in associated research funding;
>
> $ 6,500.00 in consulting fees;
>
> $ 4,001.87 in food and beverage payments;
>
> $ 6,381.79 in travel and lodging.

7.9 On information and belief, since 2014, Dr. Sotomonte has been a Principal Investigator for a Study performed by Medtronic, Inc. regarding ADAPT response, for which, on information and belief, he receives substantial compensation.

7.10 For years, defendant Sotomonte has had major influence over the contracts between Centro Cardiovascular and Medtronic PR.  Through these contracts, Medtronic PR has been given a guaranteed "market share" of the Electrophysiology Medical Devices in the Centro Cardiovascular, with the guarantee ranging from 33% to 100%.

7.11 The "market share" given to Medtronic eliminates physician and patient choice with respect to which devices will be utilized in Cardiac Electrophysiology procedures at the Centro Cardiovascular.

7.12 Over the years, Dr. Sotomonte has also benefitted from publicity promoting him by Medtronic, with his practice being highlighted in a number of "puff pieces"

included in local media, which promote both Dr. Sotomonte and Medtronic products.[7]

7.13 One such "puff piece" was published in the wire service for WIPR in September of 2019, precisely at a time when Plaintiff Dr. Nieves and two other electrophysiologists were in the process of challenging the latest Request for Proposal ("RFP") for electrophysiology medical devices.

7.14 Another "puff piece" was published that same month in El Nuevo Día, one of the principal newspapers in Puerto Rico.

7.15 These media pieces and others featured Dr. Sotomonte prominently as an innovator with respect to the use of new Medtronic products.

7.16  The article in El Nuevo Día gave the impression that the reporter was given access to the operating room where the procedure was being performed.

7.17  The Medtronic sales representative for Centro Cardiovascular, defendant Gary Hernández, is quoted in the El Nuevo Día article, mentioning that the new Medtronic device was being utilized worldwide.

7.18  According to the piece in El Nuevo Día, "the cost of this new device is some $10,000 and it is currently covered by the Federal Medicare Program."

7.19  On information and belief, defendant Gary Hernández, Medtronic's Salesperson, has developed a very close relationship with Dr. Sotomonte, based in large

---

[7]According to the on-line dictionary published by Merriam-Webster, a "puff piece" is "a story, news report, etc., that praises someone or something too much;" *See, https://www.merriam-webster.com/dictionary/puff%20piece*.  Random House Unabridged Dictionary (1997) defines it as "a newspaper article, book, public-relations film, etc., whose purpose is to praise or flatter." *https://www.dictionary.com/browse/puff-piece*.  In general it refers to publicity that contains warranted or unwarranted superlatives while underplaying any adverse information.

part on the ongoing economic relationship between Medtronic and Dr. Sotomonte.

7.20 Mr. Hernández at times gives recommendations to referring Cardiologists with whom he has contact with by virtue of his position in Medtronic PR, regarding Cardiac Electrophysiologists to perform procedures using Medtronic devices.

7.21 On information and belief, Mr. Hernández makes such referrals for patients in need of Cardiac Electrophysiology services almost exclusively, if not exclusively, to Dr. Sotomonte.

7.22 On information and belief, Mr. Hernández has also disparaged Dr. Nieves in front of physicians including Cardiologists and Cardiology Fellows on whom Dr. Nieves might depend for referrals.

7.23 On information and belief, Mr. Hernández has done so in order to favor Dr. Sotomonte and/or in response to Dr. Nieves's questioning of the RFP/Market Share, as described below *inter alia* in paragraphs *9.1 to 9.13; 10.1 to 10.2; 10.8 to 10.11.*

### E. Dr. Sotomonte's anti-competitive practices and conflicts of interests

8.1 For the last decade, Dr. Sotomonte has taken advantage of the different positions he has had at Centro Cardiovascular for his own personal pecuniary gain.

8.2 The positions held by Dr. Sotomonte at the Centro Cardiovascular - President of the Medical Staff, Director of the Invasive Laboratory, and Medical Director for the last five years - allow Dr. Sotomonte to wield significant power over administrative matters at the Centro Cardiovascular which can affect not only the staff but the quality of patient care.

8.3 Dr. Sotomonte has used the power and influence he derives from these positions of power to the detriment of the other Electrophysiologists, as well as the patients who are consumers of Cardiac Electrophysiological services.

8.4 Dr. Sotomonte has also engaged in a pattern of other conduct involving the improper use of his positions to his personal benefit and restraining free trade, *inter alia,* through the following:

(a) an agreement between the Centro Cardiovascular and a private company which provides Emergency Room service for the Centro Cardiovascular on an exclusive basis, in exchange for referrals of ER patients to Dr. Sotomonte's private electrophysiology practice;

(b) payment for a program involving the transfer of patients from select other hospitals in Puerto Rico under an exclusive contract, in exchange for referrals to Dr. Sotomonte for implantations of electrophysiology devices and other procedures;

(c) participating in and/or influencing the award of contracts for the purchase of Electrophysiology Medical Devices to assure that Medtronic PR obtains a precise market share for the purchase of devices by the Hospital for electrophysiological procedures.

(d) using his employee, Dr. Hilton Franqui, Director of the Cardiology Training Program at the University of Puerto Rico, to steer patients to Dr. Sotomonte's private practice.

8.5  On information and belief, Dr. Sotomonte has demonstrated interest in "dividing up the island," between him and one or more cardiac electrophysiologists who unlike Dr. Sotomonte, practice outside of the metropolitan area in the southern part of Puerto Rico.

### (a) Flouting The Dispensa

8.6  Dr. Sotomonte has openly flouted the restrictions of the "dispensa" from the OEG in that he continues to see a full complement of patients, on information and belief, five days a week.

8.7  He also has continued to exert influence over the assignment of operating schedules and other administrative decisions, in violation of the OEG "dispensa."

### (b) The transfer program - a treasure chest of referrals

8.8  Within weeks of first assuming the powers of the Hospital's Medical Director, Dr. Sotomonte developed and implemented a "Transfer Program," by virtue of which all patients in need of Cardiology services at four local hospitals were transferred to Centro Cardiovascular to perform these procedures.

8.9  On August 14, 2015, the defendant Corporación and Doctor's Center Hospital ("DCH") entered into a contract by virtue of which the Centro Cardiovascular agreed to provide DCH with cardiologists who would offer medical care to all the patients who needed treatment for cardiovascular conditions at DCH facilities, and transfer to the Centro Cardiovascular those patients requiring cardiovascular interventions, including Electrophysiology patients (hereinafter "Transfer Program").   The cardiology services

mentioned herein were provided by a private company sub-contracted by Centro Cardiovascular.

8.10 Dr. Sotomonte oversaw the Transfer Program and unreasonably used the same to receive in his private medical practice the referrals for Cardiac Electrophysiology procedures from the Transfer Program.

8.11 When a patient at one of the transferor hospitals required Cardiac Electrophysiological procedures, he or she was referred almost exclusively to Dr. Sotomonte, who would attend to the patient in his private practice, implanting medical devices or performing other procedures, and submitting claims to insurance providers, such as Medicaid and Medicare, or private insurance.

8.12 On several occasions, Dr. Nieves pointed out to Hospital Management the monopolistic nature of the Transfer Program and potential False Claims Act violations therein, in light of the fact that the program gave virtually exclusive referrals to Dr. Sotomonte with regard to Cardiac Electrophysiology services.

8.13 He also pointed out the blatant conflicts of interests in the operation of the Transfer Program, since as Medical Director, Dr. Sotomonte controlled the contracting of the transferor hospitals and a private company, and he used the program to enrich his private electrophysiology practice.

8.14 Dr. Nieves requested the Hospital to institute a policy to distribute the Cardiac Electrophysiology referrals to all Cardiac Electrophysiologists on an equitable basis, but this request was denied.

8.15 After Dr. Nieves pointed out the possible illegalities and conflicts of interest attendant to the transfer program, it was eliminated in approximately 2018.

### (c) Control over emergency room referrals

8.16   The Emergency Room (ER) at the Centro Cardiovascular is managed by a private company, Emergenciólogos de Puerto Rico, CSP, which is owned by three physicians who do most of the shifts in the ER at the Hospital.

8.17   In 2012, Emergenciólogos de Puerto Rico, CSP, received a pre-set compensation of $17,500.00 monthly ($210,000.00 yearly) for these services.   The contract for those services was signed by the then Executive Director on behalf of the Centro Cardiovascular, with approval by the Legal Director of the Hospital.

8.18   By 2015, the amount received by  Emergenciólogos de Puerto Rico, CSP was increased to $50,000.00 monthly ($600,000.00 yearly), an increase of more than 180 percent.

8.19   In 2017, a new contract signed by Emergenciólogos de Puerto Rico was different from all previous contracts in that it was signed not only by the Executive Director of the Centro Cardiovascular, but also required the written "visto bueno" (approval) by Dr. Sotomonte, the Medical Director.   That approval appears on the contract itself.

8.20   Ever since Dr. Sotomonte assumed positions of power in the Centro Cardiovascular, the majority of the electrophysiological referrals from the physicians employed by Emergenciólogos de Puerto Rico, CSP, for "unattached" patients, who do

not have a particular Cardiac Electrophysiologist, go to Dr. Juan Sotomonte-Ariza.

8.21 Dr. Sotomonte has refused to institute a on-call rotation program for the unattached Cardiac Electrophysiology patients who arrive in the Emergency Room, even though this has been requested by Dr Nieves and other Cardiac Electrophysiologists.

8.22 This one-sided distribution of Cardiac Electrophysiology patients at the Centro Cardiovascular is different from the Emergency Room practice with respect to the other specialties and sub-specialties at the Hospital, which work on an equitable rotation system for unattached Emergency Room patients.

8.23 Although Dr. Nieves has repeatedly raised this issue involving a clear conflict of interest between Dr. Sotomonte's duties as Medical Director and his private practice, the Centro Cardiovascular has refused to take any action with respect thereto.

### (d) Control over devices used by Cardiac Electrophysiologists

8.24 Ever since Dr. Sotomonte has held positions of power in the Centro Cardiovascular, the Hospital has assigned a designated and guaranteed "Market Share" for the medical devices used by Electrophysiologists in their procedures in the Hospital.

8.25  The selection process for medical devices to be used by Electrophysiologists, *(hereinafter referred to as "the RFP/Market Share Process")* begins with the issuance of an RFP to medical device companies.

8.26 This is followed by a period in which the medical device companies submit proposals which are presented to a Committee made up of health professionals and hospital administrative staff, for evaluation purposes and for recommendations

(*hereinafter referred to as "the Evaluation Committee"*).

8.27   After considering factors such as price, service and technology, the Evaluation Committee recommends assigning a guaranteed Market Share to one or more of the bidding companies.

8.28 These factors, by their nature, require the expertise of professionals in the field, specifically of Cardiac Electrophysiologists.

8.29   Under the RFP/Market Share Process, Cardiac Electrophysiologists at the Hospital must use a particular Electrophysiology Medical Device for each procedure paid for by the Hospital, based on a defined and guaranteed "Market Share" which results from the RFP process.

8.30 Through the RFP/Market Share Process, the Hospital has completely eliminated patient's and physician's choice with respect to which Electrophysiology Medical Devices will be used in electrophysiology procedures.

8.31 The particular device which the physician must use for each individual procedure is assigned by clerical personnel of the hospital, rather than by the Cardiac Electrophysiologist who is charged with the individual patient's care and treatment.

8.32 The Cardiac Electrophysiologist learns from the administrative staff which device he will implant in a particular procedure.  This information is provided to the physician on the same day he is doing the procedure.

8.33  As a practical matter, this means that every time Dr. Nieves has to implant a Electrophysiology Medical Device, he is forced to use a particular device as to which the

Hospital has accorded a particular "market share," independently of his medical judgment.

8.34 The RFP/Market Share Process applies exclusively to the practice of Cardiac Electrophysiology, which is Dr. Sotomonte's specialty.

8.35 While other physicians in the Centro Cardiovascular use medical devices in their procedures, contrary to the Cardiac Electrophysiologists, they are allowed to select the devices used, with the freedom to rely on their own clinical judgment to choose the devices they use.

8.36  For example, if an Interventional Cardiologist needs to implant a stent, he or she can choose among the providers which produce and market the stent and are authorized to provide this equipment to the Hospital.

8.37 Over time, Dr. Sotomonte has been the only Cardiac Electrophysiologist who has participated either as a member of or a direct "medical advisor" to the Evaluation Committee for the purchase of Electrophysiology medical devices through the RFP/Market Share Process described above.

8.38 At one point in time, Dr. Sotomonte was an official member of the Evaluation Committee.  However, after plaintiff Dr. Nieves raised ethical concerns about Dr. Sotomonte's participation in the process, this defendant claimed that was only a "medical advisor" for the group evaluating the devices to be used by Cardiac Electrophysiologists in the Hospital.

8.39 In the last decade, Medtronic PR has had a greater "market share" for these

devices, or the same as the other two companies.  It has never had a share less than the other two companies.

8.40 In 2012, the contract for providing Electrophysiology Medical Devices was awarded exclusively (100%) to Medtronic PR.  The contract was awarded when Dr. Sotomonte was the President of the Medical Staff and a Member of the Executive Committee of the Medical Staff.

8.41 The contract was awarded shortly after Medtronic's 2011 designation of  Dr. Sotomonte as  a Member of the Electropyhysiology Advisory Board for Medtronic, Inc.

8.42 In 2014, Medtronic PR was awarded a guarantee of fifty percent (50%) of the Market Share for the Electrophysiology Medical Devices at the Centro Cardiovascular. At this time, Dr. Sotomonte was still the President of the Medical Staff and a Member of the Executive Committee of the Medical Staff, and on information and believe had recently been named Director of the Invasive Laboratories as well.

8.43  In 2016, Medtronic PR was again awarded a guaranteed fifty percent (50%) of the Market Share for the devices utilized by electrophysiologists at the Centro Cardiovascular.  By this time, Dr. Sotomonte was the Medical Director, and was also an official member of the Evaluation Committee for Electrophysiology Medical Devices.

## F. Dr. Nieves's Ongoing Protected Activity

9.1 On July 1, 2016, Dr. Nieves wrote to Dr. Sotomonte to ask him about the RFP process for pacemakers and defibrillators.  He pointed out the lack of participation by other Cardiac Electrophysiologists in this process and the lack of transparency thereof.

9.2 The plaintiff wrote *inter alia* that "since the Centro is a public institution... the process should be a transparent one, with the purpose of providing the best available equipment and the best service for patients we attend to in the Hospital." *(Translation provided.)*

9.3 In response, Dr. Sotomonte admitted his participation in the questioned RFP process, albeit limiting his role at that time to that of an advisor.

9.4 On December 28, 2017, Dr. Nieves wrote to Jorge Acevedo, Country/Regional Business Director – Cardiovascular Group at Medtronic PR, addressing "a pattern of undue influences and unethical behavior from Medtronic employees against his medical practice." Dr. Nieves reported interference with his consulting physicians (referidores) and possible violations to "federal health programs" and the Anti-Kickback statute. The President of Medtronic Latin America, Mr. Hugo Villegas, was also copied in this communication.

9.5 Dr. Nieves also met with Jorge Acevedo and advised Medtronic of the role played by Medtronic Salesperson "Gary" Hernández in perpetuating schemes involving referrals to Dr. Sotomonte.

9.6 On September 13, 2018, Dr. Nieves, with two other colleagues, wrote to Hospital Management regarding the upcoming RFP for pacemakers and defibrillators, and once again objected the policy which imposed particular pacemakers and defibrillators to the Cardiac Electrophysiologists.

9.7 Dr. Nieves and his colleagues challenged the fact that Dr. Sotomonte was the

only Cardiac Electrophysiologist to participate in the RFP/Market Share Process, mentioning the conflict arising from his economic interest in the outcome of the RFP.

9.8 Two weeks later, at a meeting of the Hospital Medical Staff on September 26, 2018, Dr. Nieves reiterated his objection to the imposition of the Electrophysiology Medical Devices and also pointed out conflicts of interest involving Dr. Sotomonte, including but not limited to Dr. Sotomonte's ties with Medtronic and Medtronic PR.

9.9 These ties implicate not only conflicts of interest but also potential violations of the federal False Claims Act.

9.10 On October 1st, 2018, Dr. Nieves requested a copy of the recording and minutes of the September 26th meeting referenced in paragraph 9.8 above, as well as additional information regarding the criteria and guidelines used during the 2016 RFP for Electrophysiology Medical Devices, in comparison to the criteria and guidelines used for other Medical Devices purchased by the Hospital.  The Hospital did not accede to the request.

9.11 On October 10, 2018, Dr. Nieves wrote to Dr. Rafael Rodriguez-Mercado, then Secretary of the Health Department of the Commonwealth of Puerto Rico, and to Dr. Segundo Rodríguez-Quilichini, respectively the President and Vice-President of the Hospital's Board of Directors, concerning irregularities in the referrals deriving from the Cardiology Training Program of the University of Puerto Rico School of Medicine. In that same letter, Dr. Nieves also questioned Dr. Sotomonte's conflicts of interests, including the RFP process and Dr. Sotomonte's participation therein.

9.12 On January 24, 2019, Dr. Nieves wrote to atty. Lixy Pérez, the Hospital's Associate Director of Legal Affairs ("atty. Pérez"), asking her for a legal opinion regarding the propriety of Dr. Sotomonte's use of his position to benefit his private practice.

9.13 On February 4, 2019, attorney Pérez responded to Dr. Nieves, indicating that an investigation had supposedly been performed by the Executive Director, who would be "answering Dr. Nieves's concern shortly." *Translation provided.*  Atty. Pérez also stated "that [she] had not received instructions to issue a legal opinion about the matter." *Translation provided.*

9.14 The Hospital has never provided Dr. Nieves with the results of the alleged investigation.  Nor has he been provided any legal opinion concerning the propriety of Dr. Sotomonte's actions.

9.15 Given the Hospital's apparent disinterest in addressing the concerns raised by Dr. Nieves, he felt it necessary to present before appropriate authorities the issues involving possible public corruption, Medicare Fraud and Anti-kickback violations, as well as the violation of the OEG "dispensa".

9.16 In mid-October, 2019, Dr. Nieves met with the then Deputy Executive Director of the Hospital, Javier Marrero, who is currently the Executive Director of the Centro Cardiovascular ("Mr. Marrero").   Dr. Nieves discussed the issues mentioned above with respect to the RFP/Market Share process in specific, as well as the general issues of public corruption implicated in the practices described above with respect to

Dr. Sotomonte.

9.17 Mr. Marrero told Dr. Nieves that the issues which plaintiff was raising had recently been brought to the attention of the Executive Committee of the Medical Staff of the Hospital.

9.18 Both Dr. Sotomonte and Dr. Gladys Irizarry (wife of defendant Gary Hernández) are members of the Executive Committee of the Medical Staff of the Hospital.

### G. The 2018/2019 RFP Process

10.1 On September 13, 2018, Dr. Nieves, along with two colleagues, sent a letter to Hospital Management regarding the upcoming RFP for Electrophysiology Medical Devices, objecting to the policy which imposed the pacemakers and defibrillators on the Cardiac Electrophysiologists

10.2 Dr. Nieves and his colleagues questioned the fact that Dr. Sotomonte was the only Cardiac Electrophysiologist to participate in the RFP/process for evaluation of the equipment.  Their concern was Dr. Sotomonte's economic interest in the outcome of the RFP since he used or implanted those same devices in his private medical practice and received referrals from the benefitted companies.

10.3 As a result of Dr. Nieves' complaints, instead of awarding the RFP, the Hospital decided to put off the process of awarding the contract until 2019.

10.4 In early 2019 Sandra Soler, Director of the Operating Rooms ("Ms. Soler"), was named as the President of the RFP Evaluating Committee. Another employee,

Judith Avilés, Interim Director of the separate Invasive Laboratories, ("Ms. Avilés"), was designated as a member of the Committee.

10.5 Both Sandra Soler ("Ms. Soler") and Judith Avilés (Ms. Avilés) report directly and/or indirectly to Dr. Sotomonte.

10.6 On Feb. 17, 2019, Dr. Nieves wrote to Ms. Soler, requesting greater transparency and asking about equipment specifications, terms and conditions offered to bidders, and proposals submitted by the companies.

10.7 Dr. Nieves also inquired as to whether Dr. Sotomonte would be participating in the process or had participated in the selection of the members who would serve on the RFP Evaluation Committee.

10.8 Dr. Nieves also inquired whether there would be a market share guarantee of the sales and if the Hospital would continue its policy of imposing particular devices on the Cardiac Electrophysiologists.

10.9 The complete information Dr. Nieves requested in order to have meaningful participation in the process was never given to him.

10.10  On March 9, 2019, RFP Process No. 2019-02 was nullified as a result in large part of the inquiries and complaints made by Dr. Nieves.

10.11 A new RFP (2019-03) was published on April 5, 2019.

10.12 On May 3, 2019, the Centro Cardiovascular informed the medical device companies that in the absence of an adjudication of the RFP, the Hospital's Finance and Purchase Department would continue to purchase equipment, based on the prices

theretofore applicable.

10.13 As a result, the Cardiac Electrophysiologists at the Hospital were finally allowed free choice in the selection of medical devices for their patients, albeit on a temporary basis.

10.14 The Hospital adjudicated the pending RFP in October of 2019, by guaranteeing 33.3% Market Share for each of the three companies which market such medical devices in Puerto Rico, including Medtronic PR.

10.15  Although this adjudication was more equitable for the three competitors in the field, through the RFP/Markets Share Process, the Hospital continued to impose the precise devices on the Cardiac Electrophysiologists, without regard to clinical concerns or physician's choice.

10.16 On or about October 21, 2019, Dr. Nieves submitted a formal challenge to the RFP process.  The challenge mentioned Dr. Sotomonte's ties to the medical device companies, as well as the rule forcing Cardiac Electrophysiologists to use particular devices, and the lack of any input from Electrophysiologists other than Dr. Sotomonte.

## H. **Retaliation**

11.1  Less than three weeks after the decision to allow free selection of Electrophysiology Medical Devices, the Centro Cardiovascular initiated a disciplinary action against Dr. Nieves.

11.2 The incident giving rise to the disciplinary action took place on May 23, 2019, in the area of the Invasive Laboratory. Dr. Nieves was questioning delays in his

operations scheduled for that day, which delays he understood to be a part of a system which favored Dr. Sotomonte in the assignment of operating rooms, to the detriment of Dr. Nieves's own patients.

11.3 As a general rule, Dr. Sotomonte has had and continues to have more operating rooms assigned to him than the other Cardiac Electrophysiologists.  This is despite his duties as Medical Director and the OEG requirement that he dedicate no more than one day per week to his private practice.

11.4 Several employees in the Hospital facilitate the preferential treatment Dr. Sotomonte receives regarding the assignment of operating rooms. This includes *inter alia* Sandra Soler, in charge of the operating rooms, and Judith Avilés, in charge of the Invasive Laboratories.

11.5 Also influential with respect to Dr. Sotomonte's preferential treatment is Dr. Gladys Irizarry (President of the Medical Staff, who has an exclusive contract for anesthesiology services in the Hospital and is also the  wife of the Medtronic PR salesman, defendant Gary Hernández.)

11.6 The disciplinary action referenced above at paragraph 11.1 stemmed from an incident in the Invasive Laboratory on May 23, 2019, when Dr. Nieves questioned Judith Avilés, Interim Director of the Invasive Laboratory, as to why his patients were not being attended to as diligently as those of Dr. Sotomonte, affirming that his patients were as important as Dr. Sotomonte's.

11.7 Sandra Soler, President of the RFP/Market Share Committee, then took the

unusual step of coming over from the separate Operating Room area to the work space of the Invasive Laboratory (where she does not work), loudly proclaiming that she was "going to end all of this."

11.8 In an entirely unwarranted move, Ms. Soler activated a "clave gris" (a high-level security code), purportedly due to Dr. Nieves's improperly raising his voice and creating a "hostile environment" in the operating room area.

11.9 The "clave gris" was thoroughly unjustified. That code is reserved at the Centro Cardiovascular for situations of violence which require the immediate intervention by the Hospital security and/or by outside law enforcement.

11.10 For her part, Judith Avilés filed a report with the Police of Puerto Rico against Dr. Nieves alleging "hostile work environment."

11.11 The Police did not even take up the matter, advising Ms. Avilés that at best, she should address her concerns to the Hospital's Human Resources Department.

11.12 The Police did not even interview Dr. Nieves, who did not even find out about the police complaint until many months later.

11.13 Even if Sandra Soler and Judith Avilés are to be believed, at best they alleged that Dr. Nieves raised his voice. There was no allegation of physical violence or verbal threats.

11.14 The "clave gris" and the Police Report were in retaliation for Dr. Nieves's protected conduct in questioning the improper actions and conflicts of interests of Dr. Sotomonte and the Hospital support for his conduct, as well as the RFP/Market Share

Process, in which both Ms. Soler and Ms. Avilés participate as members of the RFP Evaluation Committee.

11.15  The pretextual nature of the "clave gris" and the Police Report can be discerned from a comparison of other incidents involving animated discussions in the Operating area of the Hospital, but in which there was no "clave gris" or a Police Report.

11.16 On the day following the issuance of the "clave gris," Dr. Nieves wrote to the Hospital's Executive Director a letter which he entitled "Denunciation of Retaliation and Discrimination in the Assignment of [Operating] Rooms."

11.17 He stated *inter alia* that there is a "pattern of discrimination and retaliation" against him, pointing out that "the law protects citizens who denounce irregularities and/or possible corruption in the government ...." *Id. Translation provided.*

11.18 Although the Centro Cardiovascular has never acted upon Dr. Nieves's complaint of retaliation and discrimination, the Hospital has continued to retaliate and discriminate against Dr. Nieves.

11.19 On June 25, 2019, Dr. Sotomonte (who was not physically present on May 23, 2019) gave his version of the events of May 23rd in a letter to the Executive Director of the Hospital, which he copied to the Deputy Executive Director, the Legal Advisor, the Director of Nursing and to Dr. Gladys Irizarry, as well as to every member of the Board of Directors of Centro Cardiovascular.

11.20 Dr. Sotomonte affirmed that the incident "occurring on May 23rd .... has repercussions in terms of the *viability of Dr. Nieves as a member of the Staff* of this

[Hospital]." *(Translation and emphasis supplied)*.

11.21 The language utilized by Dr. Sotomonte can reasonably be understood to be a threat to Dr. Nieves's medical privileges at the Hospital.

11.22 For months after the May 23rd incident, as far as Dr. Nieves was aware, nothing more occurred with respect thereto.  Nor, as noted above, was there any action with respect to Dr. Nieves's complaint of retaliation and discrimination related thereto.

11.23 This changed, however, at the beginning of November, 2019, just days after Dr. Nieves presented a formal challenge to the October adjudication of RFP No. 2019-03.

11.24 On November 1, 2019, a formal admonishment was issued with respect to the May 23rd incident. The admonishment letter, which was signed by Dr. Gladys Irizarry, the wife of Medtronic PR Salesman Gary Hernández, and the President of the Medical Staff at the Hospital, was issued over five months after the incident, in violation of the By-Laws of the Medical Staff.

11.25 Based at least in part on the June 25th, 2019 letter from Dr. Sotomonte reference above at paragraph 11.19, and other written statements, including those by Sandra Soler and Judith Avilés, Dr. Irizarry concluded that Dr. Nieves had engaged in "inappropriate conduct," which *inter alia* "promotes the demoralization of the work group which takes care of patients." *Translation Provided*.

11.26 In her admonishment letter, Dr. Irizarry went on to state that the conduct would not be tolerated in the future, and that were it repeated, the Hospital would "take all applicable measures in the Bylaws of the Medical Staff."

11.27 Dr. Irizarry sent a copy of the admonishment letter to the then Secretary of the Department of Health, Dr. Rafael Rodríguez Mercado, among others, and also had it placed in Dr. Nieves's personnel file.

11.28 To Dr. Nieves, the implication of the letter by Dr. Irizarry was clear - that his medical privileges at the Hospital were in jeopardy.

11.29  A loss of privileges would effectively foreclose Dr. Nieves from earning a living.

 11.30 The implied threat of a loss of privileges had the purpose of dissuading Dr. Nieves in his effort to assure transparency and to prevent the conflicts of interest and illegal conduct resulting from the role of Dr. Sotomonte as set forth herein.

11.31 The letter by Dr. Gladys Irizarry also came a short time after Medtronic PR participated with Dr. Sotomonte in the publication of a "puff piece" in several media outlets.

11.32 It also came shortly after the ongoing complaints by Dr. Nieves were brought before the Executive Committee of the Medical Staff, as set forth herein at paragraph 9.16-9.17 above.

11.33 Just two weeks before the November 1st admonishment signed by Dr. Gladys Irizarry, Dr. Nieves had met with the Deputy Executive Director to advise him that Medtronic PR was benefitting the practice of Dr. Sotomonte by referring patients to him and by giving promotion to his private medical practice.  He had also complained that

Medtronic PR was interfering with his referring physicians and diverting them to the private medical practice of Dr. Sotomonte.

11.34 The conduct described by Dr. Nieves potentially configures a violation of the False Claims Act and the Anti-Kickback law.

11.35 In the meantime, Dr. Nieves has continued to experience discrimination with respect to the assignment of operating rooms.

11.36 In violation of the "dispensa" which allowed Dr. Sotomonte to be named Medical Director, he continues to operate several days a week, with a very active private practice at the Centro Cardiovascular, and also continues to have a say in the assignment of operating rooms to surgeons.

## I. The Utter Absence of Due Process

12.1  On December 18, 2019, Dr. Nieves was notified of the designation of an *Ad Hoc* Committee which had been named by the Board to investigate a number of issues, including the following: whether Dr. Sotomonte should remain as Medical Director; Dr. Sotomonte's intervention with Dr. Nieves's patients; the claim of discrimination in Operating Room Assignments; the challenge to Dr. Sotomonte's participation in the RFP process; the challenge to the most RFP 2019-03; a retaliation complaint Dr. Nieves had recently lodged against Dr. Irizarry; and the monopolization by Dr. Sotomonte of the "unattached" emergency room electrophysiology patients.

12.2 The *Ad Hoc* committee is made up of people with very close personal and/or professional ties to Dr. Sotomonte.

12.3 Dr. Nieves responded to the December 18th letter, through counsel, requesting *inter alia* that the Board of the Centro Cardiovascular provide him with the specific procedures applicable to both the disciplinary action against him and his own complaint of retaliation, as well as the other matters set forth in the letter.

12.4 To date, the *Ad Hoc* Committee has not provided clear procedures on any of these matters, most notably with respect to both his complaint of retaliation and the disciplinary action against him, two matters crucial to Dr. Nieves' future. Nor has it complied with the By-Laws of the Medical Staff with respect to such matters.

12.5 In his response to the notification regarding the creation of the *Ad Hoc* Committee, Dr. Nieves "urge[d] the Centro Cardiovascular to comply with the best practices of corporate governance in sensitive matters of this nature and consider the possibility of assigning the investigation of [these] matters ..... to an *outside investigator,"* adding that "[o]nly through an *independent* investigation can light shine on these issues."

12.6 To this day, the *Ad Hoc* Committee of the Board has ignored the request, which has been repeated on several occasions, for referral of these matters to an impartial, outside investigator, who is not tied to Dr. Sotomonte, either through personal or professional loyalty.

## V. <u>DAMAGES</u>

13.1   As a result of the actions described herein, plaintiff Omar Nieves and his company, plaintiff Cardiac Rhythm Management, PSC, have suffered a loss of income

which is estimated at this time to be several millions of dollars and is expected to increase in the future.

13.2 Plaintiff Omar Nieves has also suffered emotional injury and concomitant physical ailments, including anxiety and stress, sleep disturbance, corporal aches, mood alterations, frustrations, and concern about his future and that of his family, as a result of the actions by the defendants as set forth herein.

13.3 Plaintiff is entitled to compensation for these economic and non-economic damages, which were proximately caused by the illegal actions and omissions by all defendants, as set forth herein.

### FIRST CAUSE OF ACTION
### The Anti-Retaliation provisions of the False Claims Act

14.1  This cause of action is against defendant Corporación del Centro Cardiovascular de Puerto Rico y del Caribe and defendant Dr. Juan Carlos Sotomonte-Ariza.

14.2   Plaintiffs repeat and reallege each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

14.3 Under the False Claims Act (FCA), there is liability to the United States for an individual or entity which "knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval,"*31 US.C. §3729(a)(1)(A),* or " "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." *31 U.S.C §3729(a)(1)(B).*

14.4 "Knowingly" is defined to include actual knowledge, reckless disregard or deliberate indifference. *31 U.S.C §*3729(b)(1). No proof of specific intent to defraud is required.

14.5 For purposes of the statute, a "claim" includes direct requests to the government for payment as well as reimbursement requests made on behalf of or by recipients of federal funds under federal benefit programs, including federal health care programs.

14.6 A "claim" includes any request or demand, whether or not under a contract, for money or property made to a contractor, grantee, or other recipient where the Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property requested or demanded.

14.7 A claim may be considered false or fraudulent under the FCA if it includes a certification of compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the government benefit.[8]

14.8 The Medicare Program ("Medicare Program") is a federally subsidized health insurance program for the elderly and disabled established under the Social Security Act ("Medicare Act"), *42 U.S.C. § 1395 et seq.*

---

[8]Such a "legally false" certification differs from a "factually false" certification, which involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.

14.9 Coverage and payment for services rendered to beneficiaries is administered by the Secretary of the Department of Health and Human Services ("HHS") through the Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"). CMS is responsible for developing the details of the Medicare program, through regulations and interpretive guidelines, and for overseeing the actions of the regional intermediaries.

14.10 The Centro Cardiovascular has signed Form 855A, the provider agreement for Hospitals. On this form, the Hospital has certified that it will "abide by the Medicare laws, regulations and program instructions". In addition, payment of any claim by Medicare is conditioned upon a certification by the Hospital that both the claim and the underlying transaction complying with such laws regulations and program instructions, including, but not limited to, the Federal Anti-kickback Statute and on the providers' compliance with all applicable conditions of participation in Medicare.

14.11 The Federal Anti-kickback Statute, *42 U.S.C. § 1320a et seq.*, is a healthcare fraud and abuse statute that prohibits the exchange of remuneration – which the statute defines broadly as anything of value – for referrals for service that are payable by a federal program:

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any emuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. *42 U.S.C. § 1320a−7b(b)(1−2)*.

14.12 Relevant considerations for identifying an unlawful kickback include the following: (1) whether the person being paid the alleged kickback is "in a position to generate [f]ederal health care program business;" and (2) whether at least one purpose

of the payment could be "to induce or reward the referral or recommendation of business payable in whole or in part by a [f]ederal health care program." *OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005).*

14.13 Compliance with the Anti–Kickback Statute (AKS) is a precondition for Medicare reimbursement.

14.14 At all times relevant hereto, Dr. Nieves has had a good faith belief that the practices promoted and engaged in by Dr. Sotomonte, in conjunction with the other defendants and through the individual actions of each, led to the presentation of false claims for payment to the United States, in violation of the False Claims Act, 31 USC §3729 et seq.

14.15 At all times relevant to this complaint, Dr. Nieves had a reasonable belief that Medtronic PR and its salesman Gary Hernández made referrals to Dr. Sotomonte in exchange for favorable treatment in the purchase of equipment and the "market share" guarantee. This involves false statements, in light of the Certification accompanying claims submitted for coverage for those electrophysiology devices that there was full compliance with the Anti-Kickback Statute.

14.16  At all times relevant to this complaint, Dr. Nieves has had a good faith belief that all of the defendants violated the False Claims Act in that both the individuals and the entity defendants caused the submission of claims for federal reimbursement or payment, which included certifications stating that there was compliance with the Anti-Kickback statute. These Certification were false in that the claims resulted from

providing items of value to Dr. Sotomonte and Heart Rhythm in exchange for favorable treatment, with knowledge that the claims would eventually be submitted for payment or reimbursement by the federal government.

14.17 As set forth above, Dr. Nieves has engaged in protected activity, calling into question the schemes mentioned herein and making his complaints known to Dr. Sotomonte and other officials of the Centro Cardiovascular, in addition to Medtronic and governmental authorities.

14.18 He also attempted to stop the illegal conduct by raising a number of internal complaints at the Centro Cardiovascular.

14.19 Dr. Nieves thus engaged in "lawful acts ... in furtherance of an action under [the FCA] and "other efforts to stop one or more [FCA] violations." *31 U.S.C. sec. 3730(h)(1)*.

14.20 In response to plaintiff's denunciation of the practices which he reasonably believed to be in violation of the False Claims Act, the defendant Corporación and defendant Dr. Juan Carlos Sotomonte engaged in retaliatory actions against the plaintiff, which have adversely affected the terms and conditions of his work as a physician with privileges in the Centro Cardiovascular.

14.21 The retaliatory actions include, but are not limited to attempts to disparage Dr. Nieves, discriminatory actions with respect to the assignment of operating rooms, the unjustified activation of the security code, the referral of Dr. Nieves to law enforcement, and the admonishment and threat to remove his medical privileges, thereby threatening to destroy his entire practice.

14.22  The False Claims Act, 31 USC §3730(h) provides that "(a)ny …. contractor, or agent shall be entitled to all relief necessary to make that … contractor, or agent whole, if that …. contractor, or agent is …. threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop one or more violations of this subchapter."

14.23  Pursuant to 31 U.S.C. §3730(h)(2), plaintiff is entitled to payment of his damages, plus a doubling of these amounts, as well as  litigation costs and reasonable attorneys fees.

14.24  Under applicable law, plaintiff is entitled to an award of compensatory economic and non-economic damages damages, as well as a doubling of those amounts.

14.25  Plaintiffs are also entitled to all applicable interests, costs, litigation expenses and attorneys fees.

## SECOND CAUSE OF ACTION
### Anti-Trust

15.1 This cause of action is against all defendants.

15.2 Plaintiffs repeat and reallege each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

15.3 Section 1 of the Sherman Act, 15 U.S.C. §1 provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

15.4 Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."

15.5 Section 3(a) of the Sherman Act similarly provides that "[e]very contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States .... is declared illegal."

15.6 Section 3(b) of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce in any Territory of the United States" engages in a violation of the act.

15.7 Section 4 of the Clayton Act, 15 USC sec. 15, authorizes a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."

15.8 Since Dr. Sotomonte ascended to positions of power in the Centro Cardiovascular, on information and belief, he has, in collaboration with the other defendants, engaged in anti-competitive practices, by participating in or influencing the following practices: guaranteeing a market share to Medtronic with respect to the purchase of Electrophysiology Medical Devices, without regard to patient or physician choice; granting contracts for the provision of Emergency Room services in exchange for referrals to his practice; instituting a Transfer Program for Cardiology patients from a number of Hospitals in the northern part of Puerto Rico, also favoring the referrals to

his practice; contracting one or more Cardiac Electrophysiologists as employee(s) of Heart Rhythm Management, in exchange for agreement(s) not to compete for patients at the Centro Cardiovascular; and obtaining referrals from Cardiology Fellows in the University of Puerto Rico School of Medicine program by devious means.

15.8  Dr. Sotomonte and his company, Heart Rhythm Management, have used the former's position as Medical Director of the Centro Cardiovascular to promote anti-competitive practices, for the purpose of increasing the volume of his business, and as well as that of Medtronic and its salesman, Gary Hernández.

15.9  The Corporación which operates the Hospital has also engaged in the improper tying of the delivery of necessary and crucial Cardiac Electrophysiology services to the purchase of certain medical devices from Medtronic Puerto Rico Operations Co. ("Medtronic"), a company to which the Hospital extended a guaranteed "market share" for pacemakers and defibrillators to be implanted by Cardiac Electrophysiologists at the Hospital, (ranging from 33% to 100% over the last several years), independently of the judgment by the operating physicians.

15.10  The relevant product market for this anti-competitive conduct is the provision of Cardiac Electrophysiology services.

15.11 The relevant geographical market is the island of Puerto Rico, which is the area of effective competition for patients requiring critical Cardiac Electrophysiology services in the few hospitals which offer them, of which the most prominent and best-equipped is unquestionably the Centro Cardiovascular.

15.12 The relevant consumer market affected by the anti-competitive practices delineated herein are the consumers of Cardiac Electrophysiology services, i.e. the patients in need of these specialized Electrophysiology services.

15.13 The practices set forth herein produce anti-trust injury to Cardiac Electrophysiologists, including Dr. Nieves, who provide those services without the competitive advantage gained by Dr. Sotomonte as a result of the anti-competitive practices set forth herein.

15.14 Although it has been fully apprised of the anti-competitive and otherwise illegal practices set forth herein, the Centro Cardiovascular and its Board of Directors have fomented these procedures and concurred in Dr. Sotomonte's conduct in conjunction with Medtronic and Medtronic PR, as well as with other entities and individuals not sued herein.

15.15 In combination, the defendants Corporación del Centro Cardiovascular de Puerto Rico and its Medical Director Dr. Sotomonte, as well as Medtronic PR and its Salesman "Gary" Hernández have the ability to lessen or destroy competition in the relevant market for cardiac electrophysiological services in Puerto Rico.

15.16 The monopolistic actions and improper restraint of trade, as set forth herein, violate both the Federal Anti-Trust law, but also the analogous Puerto Rico Anti-Trust law, *10 LPRA §257 et seq (Law No. 77-1964, as amended)*.

15.17 Plaintiffs Dr. Nieves and Cardiac Rhythm Consultants have suffered significant injuries as a result of the anti-competitive practices described herein.

15.18 The violations of the anti-trust laws delineated herein have been a material and substantial cause of injury to plaintiffs' business.

15.19 Pursuant to Section 4 of the Clayton Act, and Puerto Rico Anti-Trust law, *10 LPRA §268.* plaintiffs are entitled to an award of triple damages, in addition to costs, litigation expenses, interests and reasonable attorneys' fees.

15.20 Plaintiffs are also entitled to appropriate injunctive relief, including but not limited to orders prohibiting the practices delineated herein and protecting Dr. Nieves and his company from further acts of retaliation.

### THIRD CAUSE OF ACTION
### Due Process

16.1. This cause of action is against the defendant Corporación.

16.2  Plaintiffs repeat and reallege each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

16.3  The defendant Corporación acted at all times under color of law.

16.4 As a state actor, Corporación is prohibited from depriving plaintiffs life, liberty or property without due process of law, or threatening to do so, without due process of law.

16.5 Due process requires at a minimum basic guarantees for a fair hearing, including but not limited to fair and clear procedures and an impartial adjudicator.

16.6 The Corporación has deprived the plaintiff of any modicum of due process, doing so in violation of the Centro Cardiovascular's Regulation, as well as by refusing to employ procedures which would give Dr. Nieves and Cardiac Rhythm Consultants a fair hearing.

16.7 As a result of the failure of the Corporación to provide him with Due Process, Dr. Nieves has suffered damage, including but not limited to emotional injury and

concomitant physical ailments, including anxiety and stress, sleep disturbance, corporal aches, mood alterations, frustrations, loss of innocence, a sense of deception, and concern about his future and that of his family,

16.8 The plaintiffs are entitled to compensation for their sufferings caused by these violations, as well as costs, litigation expenses, interest and attorneys fees.

## FOURTH CAUSE OF ACTION
### Puerto Rico Tort Law

17.1 This cause of action is against all defendants.

17.2 Plaintiffs repeat and reallege each and every allegation contained in the previous paragraphs of this complaint as if fully alleged herein.

17.3 The actions and conduct by all defendants, as alleged herein, done with fault ("culpa"), have caused and continue to cause damage to Dr. Nieves and his company, Cardiac Rhythm Consultants.

17.4 Defendants "Gary" Hernández and Medtronic PR have knowingly interfered with the contract between the Centro Cardiovascular and Dr. Nieves, by interfering with referring physicians and referrals, as well as tactics to steer clients away from Dr. Nieves, including but not limited to do disparaging Dr. Nieves in front of referring physicians and students who are potential referring physicians after completing their studies.

17.5 All defendants have engaged in Unfair Trade practices actionable under the tort law of Puerto Rico.

17.6 All defendants have acted with culpability ("fault" or "culpa"), causing damage to the plaintiffs.

17.7 The actions of all defendants, as describe herein, violate the tort law of Puerto Rico in that they have caused damage to the plaintiffs through fault and/or negligence, and they are thus obligated to repair the damage so inflicted.

## VI. PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request the following relief:

1. An order requiring the defendants to pay actual economic damages in an amount in excess of several millions of dollars, which amount is expected to rise in the future.

2. An order requiring the defendant to pay actual non-economic damages in an amount no less than one million dollars, which amount is expected to rise in the future.

3. An order doubling the amount of damage claimed under the False Claims Act.

4. An order trebling the amount of damages attributable to the anti-trust violations alleged herein.

5. An order providing for the payment of all reasonable costs, interests, litigation expenses and attorney's fees.

6. The issuance of an injunction to stop the questioned practices and to provide Dr. Nieves with protection against further retaliatory actions, up to and including loss of privileges at the Centro Cardiovascular.

7. Whatever other relief this court deems just and equitable.

A JURY TRIAL is hereby demanded.

Respectfully submitted in San Juan, Puerto Rico this 15th day of December, 2020

**Berkan/Mendez**
O'Neill St. G-11
San Juan, P.R. 00918-2301
Tel. (787) 764-0814;Fax (787) 250-0986
berkanmendez@gmail.com

BY:

Judith Berkan                                    Mary Jo Méndez Vilella
/S/ JudithBerkan                                 /S/ Mary Jo Méndez Vilella
USDC No.200803                                   USDC No. 209407
berkanj@microjuris.com                           mendezmaryjo@microjuris.com